**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| **HEATHER TABERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:13CV393 ACL** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Heather Tabers for Disability Insurance Benefits under Title II of the Social Security Act.   This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.   See 28 U.S.C. § 636(c).   Plaintiff filed a Brief in support of the Complaint.   [Doc. 14]   Defendant filed a Brief in Support of the Answer.   [Doc. 20]

## Procedural History

On June 21, 2010, Plaintiff filed an application for Disability Insurance Benefits, claiming that she became unable to work due to her disabling condition on April 30, 2010.   (Tr. 121-22.) This claim was denied initially and, following an administrative hearing, Plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated February 3, 2012. (Tr. 69-73, 10-19.)   Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on January 15, 2013. (Tr. 4, 1-3.)   Thus, the decision of the ALJ stands as the final decision of the Commissioner. See

20 C.F.R. §§ 404.981, 416.1481.

**Evidence Before the ALJ**

A.    **ALJ Hearing**

Plaintiff's administrative hearing was held on January 4, 2012.  (Tr. 26.)  Plaintiff was present and was represented by counsel.  Id.  Also present was vocational expert Delores E. Gonzalez.  Id.

Plaintiff testified that she was married and has four biological children and one stepchild. (Tr. 28.)  Her children are ages 11, 10, 10, 7, and 3.  Id.  Plaintiff testified that she lives in a one-story house with her husband and all five children.  (Tr. 29.)  Plaintiff's toddler weights about thirty pounds.  (Tr. 51)  At the time of the hearing, Plaintiff was five-feet, five-inches tall, and weighed 145 pounds.  (Tr. 29)

Plaintiff attended one year of college; she left college after one year because she got married.  Id.  She is able to read, write, and perform arithmetic.  (Tr. 30.)  She owns a computer and that uses it to play games and participate in social media websites.  Id.

Plaintiff stated she has health insurance through her husband's employer, but does not receive Medicaid.  (Tr. 31.)

Plaintiff last worked in April of 2010.  Id.  Her last job was at Walker Real Estate Company; she performed marketing and administrative work.  (Tr. 32.)  Prior to that, she worked: part-time as a center director for a pregnancy resource center from May of 2003 to November of 2003, where she supervised approximately seven volunteers; full-time as a customer service representative for a health insurance company from August of 2005 to November of 2005 (Tr. 33); part-time as an infant photographer for hospitals from July of 2004 to October of 2004;

as an executive secretary at a church (Tr. 34); as a Western Union call center as a customer service representative from 2000 to 2003; as a receptionist at a steel factory from June of 1998 to August of 1999 (Tr. 35); and at multiple daycares prior to 1998. (Tr. 36-37.)

Plaintiff testified that she was diagnosed with lupus[1] in 2002. (Tr. 38.) She took medication for lupus from 2002 until 2005/2006, at which time she lost her insurance coverage and was unable to afford the medication. (Tr. 39.) When she remarried and regained insurance coverage in May of 2010, she resumed taking the medication. Id. Plaintiff stated that she worked during the period in which she was not taking medication. Id.

Plaintiff testified that, in addition to lupus, she has mixed connective tissue disease,[2] and Raynaud's syndrome.[3] (Tr. 39-40.) Plaintiff stated that she experiences the following symptoms of lupus: fevers, migraine headaches, cramping in the hands, and swelling in the joints. (Tr. 40) Plaintiff testified that she suffers from increased fatigue, as well as breakouts of red welts on her body when she is "emotionally or physically stressed." Id. Plaintiff stated that the welts are very painful and tender to the touch. Id. Plaintiff indicated that the symptoms of the connective tissue disease are the same as the lupus. Id. In regard to the Raynaud's syndrome, Plaintiff stated that it causes her fingers and toes to get cold, turn grayish blue and white in color, and become tender and sore. Id.

Plaintiff testified that she left her last job at the real estate company, because she was taking too many sick days, and because she was getting married. (Tr. 41.) Plaintiff stated that she

---

[1] A term originally used to depict erosion of the skin, now used with modifying terms designating various diseases. Stedman's Medical Dictionary, 1124 (28th Ed. 2006).
[2] Disease with overlapping features of various systemic connective-tissue diseases and with serum antibodies to nuclear ribonucleoprotein. Stedman's at 561.
[3] Idiopathic paroxysmal bilateral cyanosis of the digits, due to arterial and arteriolar contraction; caused by cold or emotion. Stedman's at 1911.

resigned to avoid being terminated, as she had been missing three to four days of work a month due to illness.  (Tr. 41-42.)

Plaintiff stated that she had no side effects from the medications she was taking at the time of the hearing.  Id.  She has experienced side effects from Prednisone,[4] but she only takes that for short periods when she has flare-ups.  Id.

Plaintiff has also taken antidepressant drugs for depression; at the time of the hearing, she had been taking Celexa[5] for "a little over a year."  Id.  Plaintiff testified that she sees a counselor, Tina Churchill, once a month.  Id.  She does not believe her depression prevents her from working.  (Tr. 43-44.)

Plaintiff has a driver's license and drives during the day; she does not drive at night because she is "night blind."  (Tr. 44.)

Plaintiff testified that she cooks, washes dishes, does the laundry, and shops for groceries, but she does not vacuum, take the trash out, or do yard work.  (Tr. 44-45.)  She is able to walk "a couple blocks" before she needs to rest, stand for about fifteen minutes, and sit for about thirty minutes.  (Tr. 45.)  She naps almost every afternoon, and she spends a good portion of her days lying down on her couch.  Id.

The ALJ noted that Plaintiff reported in her July 2010 function report that she engaged in the following activities:  made the beds, showered, made breakfast for the family, took care of the children, did laundry, cleaned the house, made lunch, took a nap, made dinner, washed dishes,

---

[4] Prednisone is a corticosteroid used to treat conditions such as arthritis, blood disorders, breathing problems, severe allergies, skin disease, and immune system disorders.  See WebMD, http://www.webmd.com/drugs (last visited July 18, 2014).
[5] Celexa is an antidepressant drug indicated for the treatment of depression.  See Physician's Desk Reference (PDR), 2521 (63rd Ed. 2009).

watched television, and checked her email.   (Tr. 45-46.)   Plaintiff testified that she still

performed those activities, with the help of her husband.   (Tr. 46.)   Plaintiff stated that her

husband was not working at the time of the hearing, and that he was disabled.   Id.

Plaintiff testified that she enjoys using social networking sites on her phone.   Id.   She also

decorates cakes for friends as her "hands allow."   Id.   She also attends women's ministry

meetings, which are held either at her church or at an individual's home.   (Tr. 47.)

Plaintiff testified that Dr. Esperanza Cleland is her rheumatologist.   Id.   Plaintiff stated

that there had been no change in her condition since Dr. Cleland authored his report.   Id.

Plaintiff testified that she saw Dr. Sarwath Bhattacharya in September of 2012, but she had

a difficult time understanding the doctor.   Id.   She did recall telling Dr. Bhattacharya that she was

capable of lifting 25 pounds.   Id.

When questioned by her attorney, Plaintiff testified that she naps for about three hours

during the day, and she spends about 50 percent of the remainder of the day sitting on the couch.

(Tr. 48.)   Plaintiff stated that she spends so much time sleeping and resting because she suffers

from "extreme fatigue."   Id.   She is always tired, despite sleeping eight to ten hours at night.   Id.

Plaintiff also rests due to the headaches she experiences.   Id.   Plaintiff stated that she has

difficulty concentrating when she is experiencing a headache, during which time she prefers to

stay in a dark, quiet room.   (Tr. 49)   She experiences at least one headache a week and her

migraines tend to occur during a flare-up.   Id.

Plaintiff testified that the Raynaud's syndrome causes her fingers to become cold, turn

grayish blue and white in color, and become "incredibly painful and sore and stiff and hard to

move."   Id.   She is unable to hold anything with her hands when this occurs.   Id.   Her

Raynaud's episodes occur at least once a day during the winter, and "a couple times a week"

outside of the winter. (Tr. 49-50.) The episodes are unavoidable and often occur when Plaintiff is in the middle of performing tasks such as laundry and preparing meals. (Tr. 50.) When they occur, she has to stop "as often as [she] can and warm [her hands] up." Id.

Vocational Expert (VE) Delores Gonzalez, testified next and described Plaintiff's past work as follows: case aide (light, semi-skilled); customer service representative, health insurance (sedentary, semi-skilled); executive secretary (sedentary, skilled); marketing administrative assistant (sedentary, skilled); receptionist (sedentary, semi-skilled); customer service representative, call center (sedentary, semi-skilled); photography (light, skilled); and daycare worker (light, semi-skilled). (Tr. 53.)

The ALJ asked the VE to assume a hypothetical claimant with Plaintiff's background and the following limitations: light work; occasionally climb stairs and ramps; never climb ropes, ladders, and scaffolds; and must avoid concentrated exposure to extreme cold and wetness. The VE testified that the individual could perform Plaintiff's past positions of case aide, customer service representative, executive secretary, marketing administrative assistant, receptionist, customer service representative at the call center, and photographer. (Tr. 53-54.)

The ALJ next asked the VE to assume the same limitations as the first hypothetical with the additional limitations of: a need for a sit/stand option and must avoid even moderate exposure to extreme cold or wetness. (Tr. 54.) The VE testified that the individual would be able to perform all of the jobs she indicated with regard to the first hypothetical except for the photographer position. (Tr. 55.)

The ALJ then asked the VE to assume the same limitations as the second hypothetical with the following changes: sedentary work; no sit/stand option, plus limited to frequent handling, gross manipulation, and fine manipulation. The VE testified that the case aide position would be

eliminated.   Id.

Finally, the ALJ asked the VE to assume the limitations from the third hypothetical with the additional limitation of a need for two breaks beyond the normal two breaks, and absences of as much as two times a month.   Id.   The VE testified that the individual would be incapable of competitive employment.   Id.

Plaintiff's attorney examined the VE who testified that she relied on her professional experience placing people in customer service positions when responding to the ALJ's hypothetical that included a sit/stand option.   (Tr. 56.)

Plaintiff's attorney asked the VE to assume the limitations included in Dr. Cleland's report. Id.   The VE responded that Plaintiff would be incapable of performing past work or any competitive employment with these limitations due to the limitations of sitting and/or standing/walking less than two hours per day and being absent more than four days a month.   Id.

**B.       Relevant Medical Records**

Plaintiff presented to the emergency room at St. John's Hospital in Lebanon, Missouri, on March 15, 2010, with complaints of chest pain.   (Tr. 219.)   An EKG and laboratory testing were normal.   Id.   Plaintiff was diagnosed with chest wall pain and history of systemic lupus erythematosus ("SLE").[6]   (Tr. 220.)   Plaintiff was prescribed a steroid and was instructed to follow-up with her primary care physician and a rheumatologist.   (Tr. 221.)

Six months later, on September 20, 2010, Plaintiff presented to Sarwath Bhattacharya, M.D., for an internal medicine examination at the request of the state agency.   (Tr. 249-51.)

---

[6] An inflammatory connective tissue disease with variable features, frequently including fever; weakness and fatigability; joint pains or arthritis resembling rheumatoid arthritis; diffuse erythematous skin lesions on the face, neck, or upper extremities; pleurisy; and pericarditis. Stedman's at 1124.

Plaintiff reported that she experiences flare-ups from lupus and mixed connective tissue disease off and on, and that it is worse with emotional and physical stress. (Tr. 249.) Plaintiff listed her symptoms as: neck and shoulder stiffness, low-grade fever, multiple joint pains and swelling, and macular eruptions over the body. Id. She was taking medications with good control of these symptoms, but she had stopped the medications, because she was unable to afford them. Id. Plaintiff stated that her symptoms were recurring since she had stopped taking her medications. Id. Plaintiff reported that she was able to walk six blocks and stand three hours on a good day; sit for a prolonged period of time in an easy chair; lift about 25 pounds; and climb two flights of stairs. (Tr. 250.) Upon examination, Plaintiff's gait was normal, she had no paravertebral spasm or tenderness, she was able to walk on her heels and her toes and flex and touch her toes, she was able to squat, she had no difficulty getting up and down the exam table, straight leg raise was normal, she had dexterous movement of her fingers for gross and fine manipulations, good range of movement of the upper and lower extremities, no pain or tenderness in any of the joints, and no patches of redness or macular changes in the skin. (Tr. 250-51.) Dr. Bhattacharya diagnosed Plaintiff with mixed connective tissue disease and SLE with flare-ups, which were previously controlled with medications, noting Plaintiff said she cannot afford to get medications and she has recurrence of symptoms. (Tr. 251.) Dr. Bhattacharya also noted that Plaintiff has a history of Raynaud's phenomenon, with mild polyarthritis myositis[7]; low grade fever off and on; skin ailments with raised bumps or macular eruptions on arms, back and chest; and easy fatigue. Id.

On October 18, 2010, Plaintiff went to Esperanza Cleland, M.D., at St. Louis University School of Medicine Division of Rheumatology for a consultation. (Tr. 261-63.) It was noted that Plaintiff had been seen in 1998 for mixed connective tissue disease, and that she was

_____

[7] Inflammation of a muscle. Stedman's at 1275.

maintained on Plaquenil,[8] with only occasional symptoms flares.   (Tr. 261.)   Plaintiff

discontinued the Plaquenil and did not take Prednisone when she became pregnant in 2000.   Id.

Plaintiff was seen in 2002, secondary to her symptoms of rash, arthralgias, and low-grade fevers

when her flares lasted three to four days--she opted to wait and see if the symptoms worsened

requiring the use of Plaquenil.   Id.   Plaintiff lost her insurance in 2005, and was not seen.   Id.

Plaintiff reported experiencing flares of her symptoms to include an hour of stiffness in her knees

and hands each day in the morning.   Id.   Plaintiff reported her flares increased to a week

involving low-grade temperatures, rash, fatigue, and myalgias.   Id.   Plaintiff also reported white

to dark purple color changes in her hands and feet in cold weather.   (Tr. 262.)   Upon

examination, Plaintiff had no rashes or excessive bruising, full range of motion of the back, regular

heart rate, no tenderness or synovitis in any joint, and 2/18 positive tender points.   (Tr. 262-63.)

Dr. Cleland diagnosed Plaintiff with history of mixed connective tissue disease evolved to a

diagnosis of SLE.   (Tr. 263.)   Dr. Cleland recommended that Plaintiff undergo testing.   Id.

        On November 22, 2010, Plaintiff presented to Kristin Philbrick, M.D., with complaints of

depression.   (Tr. 280.)   Plaintiff reported that she had had difficulty since her husband returned

from Iraq with significant injuries.   Id.   Plaintiff reported being less patient with her husband and

kids, difficulty getting up in the morning, sleep disrupted by vivid dreams, decreased interests, not

getting out or participating in hobbies, and decreased energy.   Id.   Upon examination, Plaintiff's

affect was appropriate and euthymic, her memory and judgment were intact, and her thought

content was normal.   Id.   Dr. Philbrick diagnosed Plaintiff with major depression,[9] gradually

---

[8] Plaquenil is indicated for the treatment of autoimmune diseases, such as lupus and rheumatoid
arthritis.   See WebMD, http://www.webmd.com/drugs (last visited July 18, 2014).

[9] A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite

worsening; she issued Plaintiff a prescription for Celexa and referred her to a therapist.   (Tr. 281)

Plaintiff presented to Dr. Philbrick on December 29, 2010, with complaints of congestion, sore throat, and cough.   (Tr. 278.)   Her mood was stable and Plaintiff felt she was dealing well with her depression.   (Tr. 279.)   It was noted that Plaintiff had not needed medication for her mixed connective tissue disease since her pregnancy.   Id.   Plaintiff was diagnosed with an upper respiratory infection.   Id.   On January 10, 2011, Plaintiff reported that she was doing better, although she still had a cough.   (Tr. 276.)

Plaintiff saw Dr. Cleland on February 16, 2011, at which time she reported no new rashes, and no joint pain or swelling.   (Tr. 259-60.)   Plaintiff complained of fatigue and Raynaud's phenomenon.   Id.   Dr. Cleland diagnosed Plaintiff with SLE and major depressive disorder.   Id.   Dr. Cleland noted that Plaintiff's fatigue, myalgias, and Raynaud's had improved.   Id.   Dr. Cleland prescribed Wellbutrin,[10] Celexa, and Plaquenil.   Id.

Plaintiff also saw Dr. Philbrick on February 16, 2011, for complaints of congestion, sore throat, a dry cough for one day, and a fever the prior week.   (Tr. 275.)   Plaintiff was diagnosed with an upper respiratory infection.   Id.

Plaintiff saw Dr. Cleland on June 15, 2011 and he found Plaintiff was "clinically stable." (Tr. 303.)   Plaintiff had no rashes and her mood was improved; she complained of occasional muscle pain; and her medications were continued.   Id.

Plaintiff presented to Dr. Philbrick on August 11, 2011, with complaints of congestion, nasal blockage, dry cough, and mild dyspnea for several days; she denied a history of fevers.   (Tr. 291.)   Dr. Phibrick diagnosed her with bronchitis.   (Tr. 292)

---

disturbances, and feelings of worthlessness, guilt, and hopelessness.   Stedman's at 515.
[10] Wellbutrin is an antidepressant drug indicated for the treatment of major depressive disorder. See PDR at 1649.

Plaintiff saw Dr. Philbrick on September 13, 2011, for follow-up regarding her depression. (Tr. 289.)   Plaintiff reported that she had been off of her antidepressant medication for several months, and had stopped seeing a counselor because schedules interfered.   Id.   She found a counselor closer to home through the "give an hour" program.   Id.   Dr. Philbrick diagnosed Plaintiff with major depressive disorder, instructed Plaintiff to continue counseling, and refilled Plaintiff's Celexa.   Id.

Plaintiff saw Dr. Cleland on October 13, 2011, at which time Plaintiff complained of memory recall difficulty, night vision difficulty, headache, and insomnia.   (Tr. 301-02.)   Plaintiff reported that her fatigue was stable, and denied any joint pain or stiffness or rashes.   (Tr. 301.) Dr. Cleland continued Plaintiff's medications, instructed Plaintiff to continue exercising, and ordered an MRI.   (Tr. 302.)

Dr. Cleland completed a "Lupus (SLE) Residual Functional Capacity Questionnaire" on October 24, 2011.   (Tr. 305-11.)   Dr. Cleland indicated that Plaintiff met diagnostic criteria for SLE.   (Tr. 305.)   The following symptoms were noted:   severe fatigue, severe malaise, poor sleep, migraine headaches, occasional impaired vision, and Raynaud's phenomenon.   (Tr. 306.) Dr. Cleland found that Plaintiff' symptoms often interfere with her attention and concentration, and that she was "capable of low stress jobs."   (Tr. 307.)   Dr. Cleland indicated that Plaintiff had no side effects from prescribed medications and described Plaintiff's prognosis as "good."   Id. Dr. Cleland expressed the opinion that Plaintiff:   could walk three blocks without rest; sit for thirty minutes at a time; stand for thirty minutes at a time; sit, as well as, stand/walk for less than two hours in an eight-hour workday; requires a job that permits shifting positions at will from sitting, standing, or walking; needs to take unscheduled breaks every thirty minutes for five to ten minutes at a time; can occasionally lift ten pounds and frequently lift less than ten pounds; can

frequently twist and stoop; can occasionally crouch, and climb ladders and stairs; has significant

limitations in doing repetitive reaching, handling or fingering; should avoid concentrated exposure

to perfumes; should avoid even moderate exposure to solvents/cleaners and chemicals; and should

avoid all exposure to extreme cold and heat, high humidity, fumes, odors, dusts, gases, cigarette

smoke, and soldering fluxes.   (Tr. 307-10.)   Dr. Cleland estimated that Plaintiff was likely to be

absent from work as a result of her impairments more than four days per month.   (Tr. 310.)

Finally, Dr. Cleland stated that Plaintiff has "difficulty with intermittent short-term memory

recall."   Id.

## The ALJ's Determination

The ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act
through December 31, 2014.

2.   The claimant has not engaged in substantial gainful activity since April 30, 2010,
the alleged onset date of disability (20 CFR 404.1571 *et seq.*).

3.   The claimant has the following severe impairments:   connective tissue disorder,
lupus, history of Raynaud's phenomenon (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that
meets or medically equals the severity of one of the listed impairments in 20 CFR
Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the
claimant has the residual functional capacity to perform sedentary work as defined
in 20 CFR 404.1567(a) except that she can occasionally climb ramps and stairs, but
must never climb ropes, ladders, or scaffolds.   She can frequently use her hands
and arms for handling, fingering, and fine manipulations of objects.   The claimant
must avoid even moderate exposure to extreme cold and wetness.

6.   The claimant is capable of performing past relevant work as a customer service
representative, executive secretary, marketing administrative assistant,
receptionist, and call center operator.   This work does not require the performance
of work-related activities precluded by the claimant's residual functional capacity
(20 CFR 404.1565).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from April 30, 2010, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 12-19.)

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on June 18, 2010, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

(Tr. 19.)

## Discussion

### A.   Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.   See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).   The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.   See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).   Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.   See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).   If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.   See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.   See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).   "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."   Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).   The

analysis required has been described as a "searching inquiry." Id.

**B.      Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired. <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. <u>See</u> <u>id.</u> If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. <u>See</u> <u>id.</u> Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. <u>See</u> 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities

of daily living, social functioning, concentration, and persistence or pace.   See

20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).   Functional loss is rated on a scale that ranges

from no limitation to a level of severity which is incompatible with the ability to perform

work-related activities.   See id.   Next, the Commissioner must determine the severity of the

impairment based on those ratings.   See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).   If the

impairment is severe, the Commissioner must determine if it meets or equals a listed mental

disorder.   See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).   This is completed by comparing

the presence of medical findings and the rating of functional loss against the paragraph A and B

criteria of the Listing of the appropriate mental disorders.   See id.   If there is a severe

impairment, but the impairment does not meet or equal the listings, then the Commissioner must

prepare a residual functional capacity assessment.   See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a

(c)(3).

## C.      Plaintiff's Claims

Plaintiff argues that the ALJ erred in determining Plaintiff's RFC.   Plaintiff also argues

that the hypothetical question posed to the vocational expert was erroneous.   The undersigned

will discuss Plaintiff's claims in turn.

## 1.      Residual Functional Capacity

Plaintiff contends that the RFC assessed by the ALJ is not supported by "some" medical

evidence and therefore runs afoul of the standards contained in Singh and Lauer.

The ALJ made the following determination with regard to Plaintiff's RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has
the residual functional capacity to perform sedentary work as defined in 20 CFR
404.1567(a) except that she can occasionally climb ramps and stairs, but must never climb
ropes, ladders, or scaffolds.   She can frequently use her hands and arms for handling,

fingering, and fine manipulations of objects. The claimant must avoid even moderate exposure to extreme cold and wetness.

(Tr. 13-14.)

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

Plaintiff argues that the ALJ erred in discrediting the opinion of treating physician Dr. Cleland when determining Plaintiff's RFC.

In making a disability determination, the ALJ shall "always consider the medical opinions in [the] case record together with the rest of the relevant evidence" in the record. 20 C.F.R. § 404.1527(b). See Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite

impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist." 20 C.F.R. § 404.1527(e)(2)(ii).

The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. Pearsall, 274 F.3d at 1219. "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)). The opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(1).

As previously noted, Dr. Cleland completed a "Lupus (SLE) Residual Functional Capacity Questionnaire" on October 24, 2011. (Tr. 305-11.) Dr. Cleland indicated that Plaintiff suffered from the following symptoms as a result of SLE: severe fatigue, severe malaise, poor sleep, migraine headaches, occasional impaired vision, and Raynaud's phenomenon. (Tr. 306.) Dr. Cleland found that Plaintiff was capable of low stress jobs. (Tr. 307.) Dr. Cleland expressed the opinion that Plaintiff could walk three blocks without rest; sit for thirty minutes at a time; stand for thirty minutes at a time; sit, as well as stand/walk for less than two hours total in an eight-hour workday; requires a job that permits shifting positions at will from sitting, standing, or walking;

needs to take unscheduled breaks every thirty minutes for five to ten minutes at a time; can occasionally lift ten pounds and frequently lift less than ten pounds; can frequently twist and stoop; can occasionally crouch, and climb ladders and stairs; has significant limitations in doing repetitive reaching, handling or fingering; should avoid concentrated exposure to perfumes; should avoid even moderate exposure to solvents/cleaners and chemicals; and should avoid all exposure to extreme cold and heat, high humidity, fumes, odors, dusts, gases, cigarette smoke, and soldering fluxes. (Tr. 307-10.) Dr. Cleland estimated that Plaintiff was likely to be absent from work more than four days per month, and that she had difficulty with intermittent short-term memory recall. (Tr. 310.)

The ALJ assigned "little evidentiary weight" to Dr. Cleland's findings of limitations, noting that they were "grossly inconsistent with the objective medical findings in the record, as well as the medical findings within his own treatment records." (Tr. 16.) The ALJ stated that the medical treatment records do not document ongoing findings of joint swelling, inflammation of the lungs or heart, or seizures. Id. The ALJ noted that there are no findings that Plaintiff's SLE resulted in significant damage to the various parts of the body, such as the brain, lungs, heart, joints, or kidneys. Id. In addition, the ALJ stated that the records from Plaintiff's treating providers do not support that Plaintiff experiences frequent and prolonged flares of severe symptoms, resulting in significant limitations of function for twelve months duration. Id.

The medical record supports the ALJ's findings. First, as noted by the ALJ, Dr. Cleland's own medical records are inconsistent with the limitations she described. At Plaintiff's initial consultation in October 2010, Dr. Cleland found Plaintiff had no rashes or excessive bruising, full range of motion of the back, regular heart rate, no tenderness or synovitis

19

in any joint, and 2/18 positive tender points. (Tr. 262-63.) In February 2011, Plaintiff reported no new rashes and no joint pain or swelling, but complained of fatigue and Raynaud's phenomenon. (Tr. 259.) Dr. Cleland noted that Plaintiff's fatigue, myalgias, and Raynaud's had improved. (Tr. 260.) In June 2011, Plaintiff had no rashes, and her mood was improved. (Tr. 303.) She complained of only occasional muscle pain. Id. Dr. Cleland found that Plaintiff was "clinically stable" at that time. Id. On October 13, 2011, Plaintiff complained of memory recall difficulty, night vision difficulty, headache, and insomnia. (Tr. 301-02.) Plaintiff reported that her fatigue was stable, and denied any joint pain or rashes. (Tr. 301.) Dr. Cleland continued Plaintiff's medications and instructed her to continue exercising. (Tr. 302.) Dr. Cleland's treatment notes reveal that Plaintiff's SLE was largely controlled with medication, and that Plaintiff reported minimal symptoms. Dr. Cleland's treatment notes do not support the presence of disabling limitations.

Additionally, the other medical evidence in the record did not support Dr. Cleland's opinions regarding Plaintiff's limitations. Plaintiff underwent an EKG and laboratory testing in March 2010, which were normal. (Tr. 220.) Plaintiff saw Dr. Bhattacharya for a consultative internal medicine examination in September 2010, at which time she reported that her medications provided "good control" of her lupus and mixed connective tissue disease symptoms. (Tr. 249.) Plaintiff reported that she was able to walk six blocks, stand three hours; sit for a prolonged period of time in an easy chair; lift about 25 pounds; and climb two flights of stairs. (Tr. 250.) Upon examination, Plaintiff's gait was normal, she had no paravertebral spasm or tenderness, she was able to walk on her heels and her toes and flex and touch her toes, she was able to squat, she had no difficulty getting up and down the exam table, straight leg raise was normal, she had dexterous movement of her fingers for gross and fine

manipulations, good range of movement of the upper and lower extremities, no pain or tenderness in any of the joints, and no patches of redness or macular changes in the skin. (Tr. 250-51.) Dr. Bhattacharya diagnosed Plaintiff with mixed connective tissue disease and SLE with flare-ups, which were previously controlled with medications, noting Plaintiff says she cannot afford to get medications and she has recurrence of symptoms. (Tr. 251.) Dr. Bhattacharya also noted that Plaintiff has a history of Raynaud's phenomenon, with mild polyarthritis myositis, low grade fever off and on, skin ailments with raised bumps or macular eruptions on arms, back and chest, and easy fatigue. Id. Finally, Plaintiff saw treating physician Dr. Philbrick for treatment of only minor acute complaints, such as upper respiratory symptoms, and depression. The medical evidence of record does not support the presence of the severe limitations found by Dr. Cleland. Thus, the ALJ provided sufficient reasons for assigning little weight to Dr. Cleland's opinion.

The ALJ also properly evaluated the credibility of Plaintiff's subjective complaints of pain in determining Plaintiff's RFC. An ALJ may discredit a claimant's subjective allegations of disabling symptoms to the extent they are inconsistent with the overall record as a whole, including: the objective medical evidence and medical opinion evidence; the claimant's daily activities; the duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medications and medical treatment; and the claimant's self-imposed restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529; SSR 96-7p.

The ALJ cited the following factors in discrediting Plaintiff's subjective complaints of disabling pain: (1) Plaintiff sought infrequent medical treatment and stopped taking her medications for significant periods of time; and there is no evidence that Plaintiff was ever refused treatment or medication due to inability to pay; (2) the medical evidence reveals minimal objective findings; (3) Plaintiff had no side effects from her medications; (4) Plaintiff cited inconsistent

reasons for stopping working in April 2010; and (5) Plaintiff engaged in significant daily activities. (Tr. 16-18.)

In sum, the ALJ's RFC determination is supported by substantial evidence on the record as a whole. The ALJ cited medical evidence in support of his determination, including the report of consultative physician Dr. Bhattacharya, as well as the lack of significant objective findings. Dr. Bhattacharya's examination was essentially normal, plus Dr. Bhattacharya noted that Plaintiff's symptoms had been controlled while Plaintiff was taking medications. (Tr. 251.) The medical record does not reveal the presence of frequent flares with significant symptoms. While the ALJ properly rejected the extreme limitations found by Dr. Cleland, he nonetheless credited some of Dr. Cleland's findings, such as Plaintiff's limitations in climbing, using her hands, and exposure to extreme cold and wetness. (Tr. 13-14, 309-10.) Plaintiff admitted at the administrative hearing that her mental impairments did not affect her ability to work. (Tr. 43.) The ALJ also performed a proper credibility analysis and found Plaintiff's subjective allegations of disabling limitations were not credible. Thus, the ALJ's determination that Plaintiff is capable of performing a limited range of sedentary work is supported by the record.

2.    **Vocational Expert**

Plaintiff also argues that the hypothetical question posed to the vocational expert did not capture the concrete consequences of Plaintiff's impairments, because it was based on the ALJ's erroneous RFC findings.

The undersigned has found that the ALJ's RFC determination is supported by substantial evidence. The ALJ concluded, based on this RFC, that Plaintiff was capable of performing past relevant work as a customer service representative, executive secretary, marketing administrative assistant, receptionist, and call center operator. (Tr. 19.) For this reason, no vocational expert

testimony was required.   See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001) ("[u]nder the five-step analysis of social security cases, when a claimant can perform his past relevant work, he is not disabled.   Once this decision is made ... the services of a vocational expert are not necessary.") (quoting Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996)).   Although vocational expert testimony was not required, the ALJ obtained assistance from a vocational expert in making the determination that Plaintiff was capable of performing her past relevant work.   Thus, no error can be found in the hypothetical posed to the vocational expert.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding Plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment.   Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of September, 2014.